Good morning, Your Honor. Peter Aknajan from Tucson, Arizona. I represent the appellant, Mr. Karunyan. I'd like to reserve two minutes, or five minutes, please. Just watch the clock, Mr. Counselor. Thank you. Your Honors, the pleadings that we submitted and the facts that we alleged in those pleadings set forth a detailed, factual basis for all of the causes of action that we allege here. We didn't sue the Attorney General of the United States. We didn't sue the Secretary of Health and Human Services. We sued an agent of the U.S. government who had direct contact with my client and we contend wrongfully arrested him. The facts that we've alleged below are summarized in our brief, in our Statement of Facts at pages 10 to 25. The appellee in its brief, in their brief, did not submit a separate Statement of Facts or their own Statement of Facts pursuant to Rule 28 of the Rules of Federal Appellate Procedure. Therefore, those facts that we've alleged are the facts that govern this case. They are not in dispute, and those facts, we contend, fully support all the causes of action that we have alleged here. So we're talking about the facts alleged in the second amended complaint and the fourth amended complaint? Yes, sir. All right. Very well. And importantly, and I'll get to this a little bit later, but not too much later. Importantly, the defendants have not put forth any alternative theory of this case that renders the theory that we have implausible. In other words, they haven't put forth any theory that's so convincing that the theory that we proposed is implausible. And that's Starr v. Wacka, as you know. Well, let's talk specifically about the dismissal of the second amended complaint's claim for wrongful arrest, because as alleged in the second amended complaint, that claim is a false or wrongful arrest without probable cause. Yes, ma'am. So can you explain to me why the totality of the facts in this case do not establish probable cause or at least do not establish a reasonable argument that an officer could believe there's probable cause in this case? Because the only thing that Agent Hanover ever had here was that a third-party billing company called MDK submitted a claim to Medicare for a different company called H&R Medical Supplies, and on that claim or those claims, they used the tax ID number of GMS, and that's Mr. Kroonjian's company. There was never any evidence that Mr. Kroonjian knew that? Well, I don't think that's all that the investigator had. He had interviews of three purported beneficiaries from California who clearly established that there was fraudulent billing going on here. So he knows that there is a fraud that occurred with regard to the beneficiaries from California. He knows that an agent of GMS billed and that the money went directly into GMS's account. He knows that Mr. Kroonjian has ties to California. His family lives there. The billing company that he used as an agent to bill is from California. And so based on the indications of fraud, he went back and interviewed Mr. Kroonjian again, and Mr. Kroonjian says, well, I don't have any customers in California, but by the way, do have customers in Nevada, when he had previously said that he only had customers in Arizona. Investigation 101 followed the money. The money from clearly established fraud, at least for probable cause purposes, went into GMS's account. So why isn't that enough to at least cause a reasonable officer to believe that I think GMS and Kroonjian is responsible for this? Well, first of all, the investigation in California never tied Mr. Kroonjian to those deliveries or sales of medical equipment. Nobody in California had ever heard of Mr. Kroonjian. They didn't hear of GMS. They had no contact with him. There was no investigation in California, as far as we know. Of course, we're at the pleading stage. We haven't done any discovery. But as far as we know, there was no investigation in California to follow up, to say, well, who was this person who came? Who do they work for? Who do they say they work for? So there was no tie between GMS and those people in California. There was no connection there. In terms of this assumption that Mr. Kroonjian received a benefit or money, at the time of this arrest, Mr. Hanover had no idea that there was any payment ever made to Mr. Kroonjian based on these billings. The statement in Ms. Park's report that GMS billed this, first of all, that statement's wrong because we know that MDK did the billing, and I suspect that what happened here is that, in fact, Agent Hanover, when he contacted Investigator Park to look into this, told Investigator Park, these are GMS billings. Would you please look into them and interview these people? All Agent Park did was interview people. She didn't look at billings. And then when she does her report back to Agent Hanover, she quotes the statement that GMS did this billing. That came from Hanover, I suspect. Not from her because she didn't look into that topic. All she did was interview people. And her report also says GMS got zero payment, no benefit. So at the time of the arrest, there was no information that Mr. Kroonjian had received any benefit whatsoever. The fact that he's from California, that doesn't mean anything, I would assert respectfully. And the fact that he honestly had forgotten that he had some Nevada customers doesn't mean anything. He didn't have any California customers. Now, having said all that, does this case or did this situation give rise to some incentive or some need to do further investigation? Absolutely. I concede that. At this stage of the game, Agent Hanover should have done further investigation. And that's why this case resembles Bigford v. Taylor, one of the cases we cited. There's a due process. Well, that's actually the problem, isn't it? Because there were available records at Medicare and at MVK and elsewhere that demonstrated that your client wasn't involved. And so had the investigation been done, it would have been clear that your client should not have been arrested. Absolutely, Your Honor. That's the problem with this whole case, is Agent Hanover leapt to a conclusion. And that's even the district court's opinions when you read them. He concluded that there was probable cause. Well, that's right, he did make that conclusion based on insufficient evidence. And had he done further investigation, he would have discovered just what Mr. Kroonjian's public defender discovered when he did an adequate investigation. And that is that he was innocent. And, in fact, he had gotten these payments the year before and immediately turned around by return letter in broken English and returned the money saying this is all a big mistake. That was completely exculpatory, and any reasonable investigator would have discovered it. This case, Your Honors, with all due respect, is one where the agent should have investigated further. He leapt to a conclusion, and he acted in bad faith. I assert based on ethnic animus, and some of the things, frankly, said in the brief by the appellee at, I believe, pages 62 and 63, sort of support that. They say, well, you know, Eurasians are engaged in Medicare fraud after all. We all know that. And, well, Mr. Kroonjian here, he was a Eurasian. That's the point I'm making, that this investigation was blinded by ethnic animus. He jumped to a conclusion. It was the wrong conclusion, and he made a wrongful arrest, violating my client's rights. So you talk about the brief. What was the treatment of the ethnic animus issue so far as the record itself is concerned? There's nothing in the documents that we have. My client alleges, and it's in the complaint, that Mr. Hanover made comments about his ethnicity, that he was part of a Russian-Armenian criminal gang doing Medicare fraud. Their brief kind of says, yeah, that's what we think he was doing. And, you know, that's wrong. It's ethnic profiling. Was that point developed during the proceedings in some way or another? I filed a complaint, Your Honor. That's all I've done. I filed a complaint four years ago. I filed a complaint four years ago. And all we've been doing is motion practice about that for the past four years. I would like to ask Agent Hanover, in deposition, many questions about the basis of this investigation, the basis of his belief, why he didn't follow up anywhere. Why he didn't ever call? Mr. Krunian said, here's MVK, here's my billing contract. Here's the contact information for MVK. Why didn't you call MVK, Mr. Hanover? Why didn't you follow up with the interviews in California? Compare this case to your case in Garcia v. County of Nearset, cited in the briefs. You talk about an investigation where they have a suspicion. Then they take the next step and they start building the case. And they follow up and they tie up loose ends. That's probable cause. That's probable cause. This is not probable cause. This might be suspicion. And as we have pointed out, and that was in, I guess, the Bigford case, the Clipper case, that you cannot base probable cause on even a reasonable suspicion. That's not sufficient. You have to have probable cause that this person committed a crime. What is your best evidence or allegation to support bad faith for purposes of the failure to collect evidence? Yes. The ethnic animus, number one. Number two, the rough treatment at the scene with the rough handcuffing that my client alleges that they say in their brief at 62, 63, no big deal. Handcuffs are made from steel. They're supposed to hurt. That's what they say in their brief. That's bad faith. I'm sorry. The grand jury testimony is bad faith. Agent Hanover went to the grand jury and misled the grand jury. He gave them a bunch of legal conclusions. He said this is typical Medicare fraud. And he didn't tell them about NVK. He didn't tell them about the exculpatory evidence that somebody else actually did the billing. He led them down a path. I mean, really, it really typifies the old adage that you can indict a ham sandwich. That was one. So those three things. Counsel, you're down to two and a half minutes.  We'll hear from the government. Your Honor, my name is Paul Stearns. I'm Assistant U.S. Attorney from Flagstaff, Arizona. I'm here on behalf of the defendant, Special Agent Warren Hanover, in the United States. As an initial matter, plaintiffs argued that we did not put forth an alternative theory or facts. We recited the facts on page five. What they failed to understand is before you get to the probability argument that they make from Iqbal, you have to first address the issue of conclusive reallogations. Counsel, let me ask you about the thing that concerns me the most here about your position in this case. The alleged crime was a crime of fraud which requires a specific intent to defraud, not merely the receipt of money by happenstance. And it appears to me that Agent Hanover had no evidence of specific intent to defraud at the time of the arrest. There just – there was no attempt to contact MVK. There was no attempt to contact Medicare. There really was – and there was nothing to demonstrate that this individual had a specific intent to defraud. And that's the crux of what concerns me about your position. Yes, Your Honor. First of all, I think we have to recognize that we're at the probable cause stage, which is a fairly low threshold. That's number one. The second thing, and plaintiffs totally negate this, is that the court – I'm sorry, that the officer as well as the grand jury can look at circumstantial evidence. They seem to suggest in their brief as well as in their allegations that we essentially have to have a confession from Mr. Karunyan before we can have evidence. Well, you have to have something. I mean, let's say I shopped at Target and somebody has got all my information and they deposit, you know, drug proceeds in my bank account, and you find out that those monies went to my bank account. Now, can you come and arrest me for, you know, drug running without trying to figure out if I had anything to do with the deposit of that money? I mean, that's really the essence of what happened here. I think that the difference between your hypothesis and what happened in this case is that we actually do have that deposit being made, if you will, by an actual agent for GMS. Be an agent for other people as well. That's like why I mentioned the Target question, because, you know, they involve – they're involved with a lot of people also. So what you really are saying is because money changed hands through somebody that they did business with who also did business with, you know, hundreds of other people, that's enough to infer that this individual had a fraudulent intent? That's my problem, because intent. There has to be probable cause to believe that there was fraudulent intent. And I think the answer to that is what did Agent Hanover know at the time of the arrest? And that's where we look at the face of the pleadings. That's where we look at paragraphs 26 through 30 of both the second and fourth amendment. And if he was willfully blind to what he should have known at that time, how do we view that? Well, I don't believe he was willfully blind, Your Honor. I mean, I don't think that's what the allegations suggest. The allegations support that on September 23, 2008, he went there after he received special – I'm sorry, Suli Park's reports. Her reports, referenced in the complaint, reviewed by the district court, clearly support that GMS had committed fraud. GMS had, that's Sarkis Kroenig. He was the sole owner. That's what they allege in the complaint. Well, what specifically are the facts that you're relying on to create that inference for probable cause purposes, that inference that there was a specific intent? Well, first of all, I'm not sure the specific intent is actually required. I mean, if you look at, for example, the State of Arizona, the Bridgeworth case, and I did not cite that in my brief, but I did recently pull that up. It's 750P2D3. It says, In summary, the amended statute does not always require the defendant to have an intent to defraud to be found culpable, but the statute does require that the State prove that the defendant acted pursuant to scheme or artifice to defraud. So there was a scheme to defraud here. That's really undisputed. For participation, what are the facts that you're relying on to create the inference of knowing participation in the fraud? Let me ask it that way. Sure. The facts are what Agent Hanover knew at the time of the arrest, which is the relevant time. The facts are, number one, he received information from Suley Park. What plaintiffs really do is attack what Suley Park's doing, not necessarily what Agent Hanover did. If you look at her reports, and if you look at the allegations in the complaint, 26 through 30, she connected clear-cut fraud to GMS, and of course the ---- But he was never asked about that. Agent Hanover never followed up with anybody about that to find out what it was about. The real question there is, is that a violation of the constitutional rights? Plaintiffs say no. Well, the real question is whether this should go to a jury. I mean, you're asking us to dismiss this at the outset without ever getting ---- allowing the development of facts that would demonstrate whether your client was in the right and was reasonable. But we're not looking at a jury verdict here and looking at the evidence in the light most favorable to the jury's verdict. We're actually supposed to look at it in the light most favorable to the plaintiff who's trying to get into court. So I guess I'm just having trouble with your approach to the case. Well, Your Honor, what I'm trying to do is look at the facts of the complaint as well as the things that were incorporated into the complaint or referenced into the complaint and say, one, probable cause is a low threshold. Number two, we had clear-cut fraud that at the time of the arrest, that's what Agent Hanover knew. It was clearly tied to GMS. GMS was solely owned by Sarkis Karunyan. Sarkis Karunyan had entered into a billing agreement with MBK in his own name, not in his corporate name if you read the contract. That billing agreement in and of itself is suspicious based upon its brevity and the fact that it has mistakes in it. What bothers me about this case, particularly with regard to the failure to collect evidence, bad faith claim, is this was dismissal at the 12B6 stage. So there's no discovery. There are allegations of racial animus, accusations of organized crime involvement. There's no discovery taken so far. And it may be at the summary judgment stage that those allegations end up being completely insufficient and they're not worn out by discovery. But the problem is the plaintiffs didn't even get a chance to go through that process. So what are we to do with that? Well, first of all, I think that's a red herring, Your Honor. But number one is you don't get to sue first and do discovery to support your claims, especially in the context of a qualified immunity analysis. Number two, if we look at the face of the complaint, paragraph 41, the second element of complaint are the allegations. But now we're looking at the allegations, right? And unless they're insufficient under Iqbal, we're to assume that these allegations are true for purposes of evaluating dismissal at the 12B6 stage. So there are allegations regarding racial animus that he was accusing him of organized crime involvement without any factual basis whatsoever. So what is your argument that those allegations are mere conclusions? We are to cast them aside for bad faith analysis? Yes, Your Honor. Well, first of all, I think, you know, if you read my brief, I do a pretty good job of detailing the changes in their allegations. They are not entitled to believe. They are conclusions. They are contradictory. If we look at the Second Amendment complaint, they start off by saying that Agent Hanover suggested that he may be involved in some type of organized crime. In response to both the district court's order dismissing the Second Amendment complaint as well as my motions to dismiss, they then change their allegations substantively from the Second Amendment complaint where it says suggested to the Fourth Amendment complaint where it says accused. And so they've changed that substantively. But that's not a constitutional violation. It may be a coercive tactic, but that's not a constitutional violation. It is, in my view, it's good police work. What we have here is a real crime committed by a real person. You can certainly ask questions about that. But the wrong person, obviously. That's not the case, Your Honor. We don't know that from the face of the police. What this case did was stop the criminal investigation. So we don't – when they say that it's the wrong person, we don't necessarily know that. Well, what about the proceedings which followed later? I'm sorry, Your Honor. What is that? What are you referring to, Your Honor? I apologize. I'm talking about the Maricopa deputy county attorney, Valadez, who eventually ended up filing a motion to dismiss the criminal case which was granted. And it was dismissed without prejudice. And it was dismissed after – this goes back to the type of evidence we have again. To have a bad faith theory to collect evidence, the evidence must be apparent to the officer at the time. But you can't – you know, it's all wrapped up together. Because what you have here is an allegation that Hanover falsely believed that Mr. Karanian was involved with the Russian-Armenian crime organizations. He was accused or suggested, whatever verb you want, that Mr. Karanian was a fraud who was working with the Russian and Armenian crime organizations based solely on his race and accent, and that that motivated him not to investigate. Now, this may not turn out to be true, but these are allegations that we must take as true for the purpose of determining whether to dismiss this outright. And it is alleged that the indictment was false and that it was entirely the fault of MVK that made a mistake in the billing, and we must take that as true also. Your Honor, I don't believe you do. Those are conclusions of law. They're not supported by fact, and they're contradictory. They're also contradicted by the evidence that was incorporated in the complaint. I mean, both parties, in fact, I believe, submitted the grant jury transcript. There's nothing in that grant jury transcript that's unusual. When he talked about typical Medicare fraud, he actually referred to, quote, typical Medicare fraud. When they talk about conclusions, he's not the prosecutor. He was not free to say whatever he wanted. But I think there's a question whether GMS was involved at all or whether MVK was the culprit in making the mistake. That's not conclusory. That's factual, and we have to take that as true. But you may have to take that as true, but you don't necessarily have to go to the next step and say that there's no evidence whatsoever to tie him to this crime. What we have to look at is at the time of the arrest and what Agent Hanover knew, not the things that were developed after the fact. What we don't know at the time is claims keep saying he didn't find this information, he didn't find that information. They have to show that he didn't find that in bad faith. Well, but that's the point of the allegations about his racial animus. And again, it may or may not turn out to be true. You're making a great jury argument, but we're not there yet. Well, in fact, I think that's the reality, is that the plaintiffs are trying to make jury arguments. Yes, but they're entitled to. That's what our Constitution allows them to do, is to file a complaint and have a jury of their peers decide what the facts are if they've made out any kind of claim at all. But to make out a claim, you have to have a conscious effort to suppress exculpatory evidence. The district court was correct when it said that they didn't show that. There's three types of evidence that plaintiffs said that Agent Hanover did not collect. The first type of evidence was that MBK did the billing and not GMS. Now, as the district court correctly recognized, that's something that Agent Hanover already knew. But when you look at the accountability statutes, when you look at probable cause, and we look at circumstantial evidence, including the fact that he made inconsistent statements to Agent Hanover, that he did business in California, that he used a California billing company, that he was trying to sell his business in California. Where does the record suggest that he did business in California? He used a MBK was based out of California. Okay. That's different. He used the services of someone else who was in California. Right. Did he otherwise do business in California on this record? Well, what Agent no, no. Okay. He didn't do business in California, but Agent Hanover believed he did business in California based upon what he received from Suley Park. And, again, the relevant time is what he knew at the time. There's no conscious effort to suppress exculpatory evidence at the time. The evidence that they say was exculpatory, number one, the district court was correct. It's not truly exculpatory because loss wasn't a factor in either the identity theft or fraudulent schemes. So it wasn't truly exculpatory in that regard. But, moreover, the district court was correct because Agent Hanover already knew this information. If you look at page 21 of Plaintiff's reply brief, their whole argument is basically that Mr. Coronia cannot be held accountable because he wasn't charged either with a conspiracy or under the accountability statutes. And those propositions, that's Basic Prosecutor 101, whether it be 18 U.S.C. Section 2 or Arizona Revised Statute Section 13-303, you can be held accountable, even if they don't allege that in the charging documents. And they say, as a matter of law, he can't. And that's, in fact, false. It's U.S.B. Jones from this court, 678 F2D at 105, and State v. McAnally, 704 P2D at 293. I mean, it's, in fact, wrong what they say in their brief. They don't get a due discovery here. They have to state claims first. And if we look at what did Agent Hanover know at the time, what caused him to go out there, what is clear, the reasonable inferences are clear, is that he received the reports, which they allege in their complaint, from Suli Park. He then went to the place of business. Those reports unequivocally state that GMS committed fraud. Again, GMS is owned by Sarkis Coronian. He entered into a billing agreement. That's what he went out there. He then interviewed for a second time. In their brief, they claim the interview never even happened. He couldn't explain the fraudulent buildings in California, and he made inconsistent statements. And lastly, Rieberg case says you can't look at the grand jury. He has absolute immunity for those things. So we believe that the district court made a correct decision. They've had five chances to state claims here. The briefs are well-documented. What we put in our briefs is well-documented of their conclusory allegations and their change in their allegations from their second amended complaint where they took out substantive facts to try to save their claims. And what I would point the court to is look at the second. Counsel, your time has expired. Thank you very much. I'm sorry. It's just showing time. I'm sorry. No, it's showing overtime. Oh, I apologize, Your Honor. Thank you.  Thank you. Mr. McMajor, do you reserve some time? Thank you, Your Honor. One of the statements Mr. Stearns made is wrong. Agent Hanover did not go back a second time and confront Mr. Carunian with these transactions in California. He just asked him again, do you do business in California? Or he said something like, I think it speaks for itself, interview summary, why are there transactions in California? He did not present him with the park findings and say, what about this? Why didn't he do that? I want to ask him that question in a deposition. I filed a pleading here. I filed a pleading. The pleading meets all the standards that the Supreme Court ---- What about the shifting allegations between the various versions of the complaint? It got better, right? Look, I ---- Particularly with regard to racial animus, which I think if we were to accept the latest version of the complaint regarding racial animus, that's your best case. But you didn't get there until after multiple amendments. I think I got a little better on the racial animus thing. I agree with that. I don't think it changed substantively. I think the wording changed somewhat. But I guess I'm in a position of the district court dismissing my complaint and saying, amend this and make it better. Okay. I will amend it and make it better. I can assure you, Your Honors, that I am well aware of my obligations under Rule 11 to plead things that I believe are true. And I think I did that. And I don't think really anything in these pleadings has changed all that much. I haven't just ---- And we cited a case in the brief about people that just completely flip-flopped in their pleadings about certain things. That didn't happen here. We've refined things, made them somewhat better. But why didn't Agent Hanover ask Mr. Krooning specifically about these things in California? Was this interrogation meant to ferret out the truth, or was it meant to nab this guy? That's really the issue. We filed a pleading. We set forth in our brief, in our summary of argument, the formulation beginning at page 25 under the Starr case. This meets it. We have detailed factual allegations. We comply with Rule 8. We set forth valid causes of action, well-recognized causes of action. We're not suing high government officials for conspiracy. We have set forth a plausible claim, and they have never set forth an alternative that makes our claim implausible. They don't have a statement of facts in their brief. They have no statement of facts in their brief. They accept ours. This case was wrongly decided. It should be reversed. Thank you. Thank you very much, counsel. The case just argued will be submitted for decision, and the court will adjourn.
judges: O'scannlain, Graber, Nguyen